IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

*FILED*

FEB 23 2009

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CRIMINAL ACTION NO. 1:08CR83-01

EDGAR HENRY and
KIMBERLEY HENRY,

Defendants.

## REPORT AND RECOMMENDATION/OPINION
### I.
### Procedural History

A. Motions History

On the 16th day of November, 2008, Defendant Kimberley Henry filed a Motion to Suppress

Evidence [Docket Entry 16] and a Motion to Suppress Evidence Pursuant to Franks v. Delaware

[Docket Entry 17]. On November 17, 2008, Defendant Edgar Henry filed his Notice of Joinder in

the Pre-Trial Motions of Co-Defendant Kimberley Henry [Docket Entry 18]. The Court entered an

order permitting Co-Defendant Edgar Henry to join in Kimberley Henry's pretrial motions. The

matter was referred to the undersigned United States Magistrate Judge by United States District

Judge Irene M. Keeley on November 18, 2008 [Docket Entry 19]. The United States responded to

the motions on December 1, 2008 [Docket Entry 23].

On December 3, 2008, came the Defendants, Edgar Henry and Kimberley Henry, in person,

and by their counsel, Charles T. Berry and Brian J. Kornbrath, respectively, and also came the United

States by its Assistant United States Attorney, Shawn A. Morgan, for hearing on Defendants'

motions and the United States' response thereto. During preliminary matters to the hearing, Counsel

for Defendants advised the Court that they anticipated presenting the testimony of an engineer with

respect to certain factual issues involving the Henry's property and relevant to the issues raised in their motions. Counsel for Defendants acknowledged that the Government had not yet been provided discovery with respect to the witness. Additionally, counsel for each Defendant requested time to review the proffers made during the 2005 suppression hearing to determine if those proffers covered the same issues and evidence being raised in the present motions. The Government moved for continuance of the hearing to review discovery regarding the engineer witness, to determine whether objections to the evidence may be appropriate, and to prepare for cross-examination of the witness, if necessary. In effect, both parties requested additional time, and neither party objected to the other's request. The cross motions to continue the hearing were granted and the hearing was continued to December 22, 2008.

During the December 22nd hearing the Government advised that it believed it had additional evidence that would rebut certain evidence/testimony adduced by Defendants. The record was again held open until January 20, 2009 for the receipt of the additional evidence and its review by Defendants.

On January 20, 2009, counsel for Defendant Edgar Henry filed a Motion to Continue Hearing based on personal illness that would make it impossible for him to attend [Docket Entry 37]. That motion was unopposed by Kimberley Henry or by the Government. The motion was granted and the hearing was rescheduled for January 23, 2009.

The hearing was held as re-scheduled on January 23, 2009, with Defendants, Edgar Henry and Kimberley Henry appearing in person, and by their counsel, Charles T. Berry and Brian J. Kornbrath, respectively, and United States appearing by its Assistant United States Attorney, Shawn A. Morgan. The evidence was closed following this hearing.

**B. Case History**

Defendants Edgar Henry and Kimberly Henry were indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on October 7, 2008. The three-count indictment charges both defendants with conspiracy to manufacture, distribute and possess with intent to distribute 100 or more marijuana plants (Count One); aiding and abetting in manufacturing marijuana (Count Two); and aiding and abetting in possession with intent to distribute marijuana (Count Three). The indictment also contains a forfeiture count.

Summonses were issued, and Defendants were arraigned and pled "not guilty" on October 30, 2008.[1]

## II. Statement of Facts Relevant To Affidavit In Issue

Two search warrants were issued and executed during the investigation of this case. The first warrant was issued on July 13, 2004, and was for a thermal imaging scan.[2] It was executed on or about July 16, 2004. The second warrant was issued on or about July 19, 2004, and was executed

---

[1]Defendants were previously indicted on the same charges by a grand jury on November 3, 2004. Motions to suppress and for Franks hearing were denied in that case and Defendants both pled guilty on July 4, 2006, both reserving their rights to appeal the denial of their motions to suppress and their motions to dismiss due to violation of the Speedy Trial Act. Both Defendants appealed these issues, along with the District Court's relevant conduct determinations, to the Fourth Circuit Court of Appeals. On August 19, 2008, the Fourth Circuit reversed, vacated, and remanded with instructions to dismiss the indictments, based solely on the Speedy Trial Act issue. The Court did not address the suppression motions. The District Court dismissed the indictments without prejudice, and Defendants were subsequently re-indicted.

[2]The United States Supreme Court determined that the use of thermal imaging equipment to discern "details of the home that would previously have been unknowable without physical intrusion" is a search, unreasonable under the Fourth Amendment unless supported by probable cause and, presumptively, authorized by a warrant. Kyllo v. United States, 533 U.S. 27, 121 S. Ct. 2038, 2046, 150 L. Ed.2d 94 (2001). In the case at bar, Sgt. Manning did obtain a search warrant before conducting the thermal imaging scan of the Henry property. The issue therefore is whether probable cause supported the issuance of that warrant.

on or about July 21, 2004.  The second search resulted in the seizure of numerous items of alleged

contraband described in the return of the warrant.[3]

The affidavits in support of the search warrants are in evidence, but facts therein are disputed.

The first search warrant application was made by West Virginia State Trooper Sgt. Michael

Manning.  In support of the first search warrant, requesting a thermal imaging scan, Trooper

Manning stated, in pertinent part:

A)      In September 2003 the Clarksburg, West Virginia Post of Duty of the United
        States Drug Enforcement Administration received information regarding an
        indoor marijuana grow operation near Rosedale, West Virginia.  First
        Sergeant Steve Jones of the West Virginia State Police, Bureau of Criminal
        Investigation, Charleston, West Virginia office advised that he had received
        information from an anonymous source that Edgar and Kimberley HENRY
        had a large indoor marijuana grow operation at their residence in a rural,
        remote area near Rosedale, West Virginia.  Additional information 1st
        Sergeant Jones received was that the location was a farm house located "at
        the head of Anthony Fork" near Rosedale, West Virginia, and that Edgar and
        Kimberley HENRY were believed to be from New Jersey.

B)      An inquiry into the West Virginia Department of Motor Vehicles data system
        revealed an Edgar HENRY DOB: 01/28/1947 and Kimberley HENRY DOB:
        02/28/1958 with a physical address of Route 3, Box 4-B Rosedale, West
        Virginia, and a mailing address of Post Office Box 67, Rosedale, West
        Virginia.  The HENRYs' physical address is located in Gilmer County near
        the juncture of Gilmer, Braxton and Calhoun Counties.  The Rosedale post
        office used as the HENRYs' mailing address is located in Braxton County.

C)      A criminal history check of the name Kimberley HENRY revealed no arrest
        history.  In checking for any criminal history on Kimberley HENRY it was
        noticed that her Social Security number began with 149, indicating it was
        issued in the State of New Jersey, which is consistent with information

---

[3]Defendants contend that if the first warrant is found not supported by probable cause, the
second must also fail, because "[t]he second warrant simply repeated the allegations contained in
the first warrant and then included the results of the thermal imaging scan.  The search of
defendants' residence took place thereafter."  Further, the second warrant would be invalidated as
"fruit of the poisonous tree."  See Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9
L.Ed.2d 441 (1963).  (Defendant's Motion at page 6).

provided by first Sergeant Jones.

D)     A criminal history check of the name Edgar HENRY revealed drug related arrests by the Rockville, Maryland Police Department in 1972, and a possession of marijuana arrest by the Maryland State Police in 1993.

E)     Your affiant was advised by West Virginia State Police Sgt. T.F. Yanero that on 11/01/2002 he and Tpr. K.W. Huddleston interviewed Phillip Lee SANDY at the Central Regional jail, Flatwoods, WV in reference to his knowledge of drug related activity. SANDY stated that he has purchased small quantities of high quality marijuana from Kimberley HENRY on four to five occasions in the past. Sgt. Yanero advised that SANDY stated that Kimberley and Edgar "Chip" HENRY had built a building behind their residence specifically for hydroponically growing indoor marijuana. Sgt. Yanero advised that SANDY stated that the HENRYS moved to West Virginia from the Washington D.C. area and that Kimberley HENRY had some kind of Internet-based business and had worked for the Internal Revenue Service. SANDY provided Sgt. Yanero and Tpr. Huddleston with a hand-drawn map of the location of the HENRY residence. SANDY was incarcerated at the time on a WV state charge of failing to register as a convicted sex offender. Sgt. Yanero stated that SANDY was initially cooperative; however, his cooperation lasted only until he was released from jail.

F)     In reviewing the arrest record of Edgar "Chip" HENRY it was noticed that HENRY had an arrest record in both Rockville, MD (a Washington, D.C. suburb), and Pikesville, MD (a Baltimore, MD suburb approximately fifty miles from Washington D.C.). The arrest information corroborates information from Phillip SANDY that Edgar HENRY may have moved to West Virginia from the Washington D.C. area.

G)     On February 23, 2004, your affiant conducted aerial surveillance on the HENRY residence. The residence was in a remote location in an area known as the Head of Anthony Fork in southern Gilmer County, WV. The residence appeared to be tan in color with a building situated to the rear of the main residence. The building had what appeared to be an enclosed walkway connecting the residence and the rear building. The residence is situated near the center of an approximately seventy-seven acre parcel of mostly wooded land. The residence is in a rural and remote area, with the nearest residence being approximately one mile away. The HENRY residence and surroundings appeared to match the description and map as given by SANDY to Sgt. Yanero.

5

H) At approximately 1:00 a.m. Friday, March 18, 2004, your affiant, S/A L.D. Maxey, and WVSP Sgt. J.M. Garrett conducted surveillance on the Henry residence by walking along the roadway in the area of the residence. There was a light on in the residence and what appeared to be the flickering of a television. There was also a light on in the rear building, which was connected to the residence by the enclosed walkway. Your affiant was able to get within twenty to thirty yards of the rear building by traveling through a wooded and brush covered hillside to the rear of the HENRY residence and connected building. Your affiant was able to see into an approximately eight foot wide by thirty foot long section to the rear (south side) of the building. The remainder of the building was obscured by a wall on the illuminated interior section and there were no windows on the remainder of the visible side (east side) of the building. There were two large hooded type lights visible, hanging from the wall in the illuminated section of the building. There were two ceiling fans operating in the illuminated section. The was an audible sound from what appeared to be a large ventilation fan coming from the roof area of the building. The outdoor temperature at the time was approximately forty-five degrees Fahrenheit.

I) On Monday, May 10, 2004 your affiant was contacted by WVSP Trooper M.R. Yost of the WVSP Sutton Detachment. Tpr. Yost advised that on Thursday May 6, 2004 Edgar "Chip" HENRY allegedly arrived at the R&L Grocery in Rosedale, WV and was threatening persons there who were attempting to organize a "neighborhood watch program," and was threatening to put a stop to them "one way or another". Tpr. Yost advised that after doing follow up investigation and interviewing witnesses he obtained an arrest warrant in Braxton County Magistrate Court, charging HENRY with assault and disorderly conduct. Tpr. Yost advised that he and two Braxton County Deputy Sheriffs located Edgar "Chip" HENRY in the community of Rosedale, WV on Saturday, May 8, 2004, and served the arrest warrant on him. Tpr. Yost stated that during a search of the person of HENRY pursuant to his arrest and prior to placing him tin the Central Regional Jail, a small quantity of marijuana was found on the person of HENRY. Tpr. Yost stated he subsequently charged HENRY in Braxton County Magistrate Court with possession of marijuana.

J) On June 19, 2004 your affiant contacted Tpr. K.W. Huddleston at the WVSP Sutton Detachment and was advised that in 2002 he had been involved in the investigation of a marijuana grower named Billy YOST in Rosedale, WV. YOST was prosecuted in federal court in the Northern District of West Virginia. Tpr. Huddleston advised that Kimberley HENRY was present in the courtroom for every court appearance YOST had.

K)      Your affiant has reviewed court docket sheets to confirm that Billy Lee YOST was prosecuted in federal court in the Northern District of West Virginia, pleading guilty on May 23, 2002 to one count of manufacturing marijuana. YOST was sentenced on August 21, 2002 to 24 months imprisonment and three (3) years supervised release. YOST was discharged from BOP custody and placed on supervision on May 26, 2004,

L)      Your affiant has contacted Gilmer County, WV Deputy Sheriff James Moss. Dep. Moss advised that he has received information from a confidential source over the past four years that "Skip" HENRY and his wife "Kim" HENRY have been growing and distributing marijuana in the Rosedale, WV area. Deputy Moss stated he has not acted on information from the confidential source, as the source was elderly and feared retaliation.

M)      On June 19, 2004 your affiant obtained a U.S. Department of Justice/Drug Enforcement Administration administrative subpoena for the electrical power records of the Edgar and Kimberley HENRY residence located at Rt. 3 Box 4-B and/or P.O. Box 67, Rosedale, WV. Your affiant caused said subpoena to be served upon Allegheny Energy, Inc., Greensburg, PA. On June 21, 2004 your affiant received from Allegheny Energy, Inc. power usage records for the Kimberley C. HENRY residence, Rosedale, WV. The most recent electric meter reading was for a 59 day period ending on May 13, 2004. The electric usage for that period was 11,254 kilowatt hours with a billing charge of $751.78. The Allegheny Energy records showed a consumption/billing history going back fourteen billing periods (approximately 28 months). During the previous fourteen billing periods, the HENRY residence had an average electrical consumption of 10,870 kilowatt hours, with an average billing of $728.09.

N)      Records obtained from the Gilmer County, WV Assessor's office indicate that the Edgar C. and Kimberley C. HENRY residence, having an address of P.O. Box 67 Rosedale, WV has a living area square footage of 1,460. The Assessor's office records further indicated the residence has a total of five rooms, three of which are listed as bedrooms, and that the residence is heated by gas.

The first search warrant was issued by the undersigned United States Magistrate Judge.[4]

---

[4]In support of the second search warrant, Trooper Manning stated the same facts as listed above, plus the following:

A) On July 16, 2004, he, West Virginia State Police Sgt. Mike Garrett, and Special

## III. Synopsis of Second Hearing Evidence

Agent Kenneth Winkie traveled to Defendants' residence to conduct surveillance. Special Agent Winkie remained with the vehicle while Trooper Manning and Sgt. Garrett traveled on foot along Secondary Route 14/6 to the area of the Henrys' residence. At approximately 2:30 a.m,. they were in a position to conduct visual surveillance of the residence. The interior lights were turned off and no signs of activity were detected. It was noticed that an air conditioning unit located on the east wall of the rear attached building was running. The temperature in the area at that time was 58 degrees F. The air conditioning unit did not shut off during the thirty-minute time frame Trooper Manning and Sgt. Garret were at the scene. The air conditioning unit was located in the area previously described by Sandy as being built specifically for growing indoor marijuana. It was observed that an air conditioning unit located on the east wall of what was believed to be the residence portion of the structure did not appear to run during the same time period. It was also noted that a large dog was located just to the east side of the attached rear building, preventing closer access and surveillance through the wooded section to the south side of the residence;

B) Trooper Manning and Sgt. Garrett traveled to the west side of the residence along Secondary Route 14/6. Using light intensifying night vision goggles, they observed light escaping from the area of the attached rear building. The light appeared to be coming from the top area of what appeared to be a garage door or large doorway on the west side of the building;

C) Manning and Garrett also observed the residence and attached building with a thermal imaging unit pursuant to the first search warrant issued by the undersigned. The thermal imaging unit indicated a higher amount of heat being emitted from the attached rear building of the residence. The thermal imaging unit indicated that most of the rear attached building was insulated; however, the lower section and the south wall did not appear to be insulated, and the heat radiating through those areas was much greater than the remainder of the residence. The thermal imaging unit also indicated a large amount of heat being emitted from the air conditioning unit located on the east side of the rear portion of the building.

The undersigned United States Magistrate Judge issued the second search warrant based on the above.

At the second hearing[5], Defendants called Mark D. Smith, a certified professional engineer and land surveyor, licensed in West Virginia. Mr. Smith testified he has been a practicing engineer for the past 25 years, and a licensed land surveyor for approximately 20 years. The government had no objection to Mr. Smith being qualified as an expert. Mr. Smith testified he was present on Defendants' property on November 18 and 26, 2008, and took photographs. He also drew several plats of the property, and drew sight lines to the building at issue from points 20 and 30 yards from the building. He testified that he could only see at the maximum 4 ½ to 5' up the 8 ½ foot wall. He also testified he was on the ground at the time and the distance up the wall would be even smaller if one were standing making the observations. He concluded that one could not possibly see the ceiling fan or the top of the inner wall from 20-30 yards away. Even walking down the slope from his position 20-30 yards away, he could not see the ceiling fan. He stopped at a gas meter right at the top of the cut of the slope and crouched, and still could not see the ceiling fan.

Mr. Smith then opined that the ceiling fan could not have been seen 20-30 yards from the building. He subsequently testified that the ceiling fan may have been seen if one were within 8-10 feet of the building, crouching, and looking up.

Upon cross-examination by the Government, Mr. Smith conceded that he had not been at the property in 2004, nor at any time before November 2008. He was also there in the daytime, not at night as Sgt. Manning was. He did not approximate measurements in the dark by "eyeballing" them, but instead used precision surveying equipment. He conceded that the distance may have appeared different at night. Upon inquiry about dogs, Mr. Smith noted that the dogs had been put in the house

[5]"Second Hearing" refers to the series of hearings that are herein outlined as having taken place between 2008 and 2009 relative to the Motion For A Franks Hearing and Motion To Suppress Evidence in the 2008 Indictment Case.

"because they knew he was coming." He also testified he did not see anything that indicated the topography had been changed since 2004.

Mr. Smith testified he also did a "practical" test, putting a ladder underneath the ceiling fan. Standing on the ladder, he could not see the ground even six to eight feet out the window.

Defendants then asked to call Sgt. Manning for the limited purpose of testifying as to where he was standing. The Government responded that on page 133 to 134 of the joint appendix (containing the transcript of the original hearing), the government proffered that "Trooper Manning remained in the brushy-wooded area as he indicated, 20 to 30 yards from the rear south portion of the outbuilding or the - - the section that he viewed, as listed in the affidavit," stating that proffer was consistent with Sgt. Manning's affidavit in support of the search warrant. The Government reiterated that Sgt. Manning 'was 20-30 yards from the building. Defendants then conceded that, if the government was going to stand on its proffer, there was no reason to call Sgt. Manning.

Defendants then called Kimberley Henry to testify for the limited purpose of explaining government exhibit 5, the gas generator, and that the topography of the property had not changed between 2004 and November 2008. Ms. Henry testified that the gas generator was present during the 2004 search, but was in a small lean-to at the east end of the shed, so that a person would have had to drop down a plywood panel that protected it. She testified the generator was used during power outage. If the power was on, the generator was not. She could not recall if the power had gone out in July 2004. She also testified that there had been no change to the property between 2004 and 2008.

The Government then called Sgt. Manning, who testified he recalled going to the Henry residence in 2004, late in the evening to early morning, probably around 1 a.m. He walked in from

a gated road in the darkness. He stopped prior to the house and walked up a hillside along the woodline to an area beyond the house. No man-made fences, etc. separated the house from the wooded area, but there were very thick, thorny, multi-flora-type bushes between the two areas. He did not actually measure his distance from the residence, but only estimated it to be about 20-30 yards. He could not have gotten any closer than he was, because of the brush and several dogs he had seen earlier during aerial surveillance of the property. He believed people were present in the residence because he had seen a flickering light in the residential portion, which appeared to be a television set.. Sgt. Manning acknowledged that there was only one ceiling fan in the building, and not two, as he stated in his affidavit, but testified that lights were on in the building and as he traveled through the woods using night-vision goggles, he thought he saw two. He also acknowledged that the two hooded lights he saw in the building were not there at the time the search warrant was executed, but they "were recovered elsewhere in the residence."

Sgt. Manning testified that there was an audible sound from the back building, which he believed was from a fan or ventilation-type equipment. He then noted that the search showed an air conditioner on the side of the structure, with a small ventilator-type fan in a small shed that contained a generator.

Sgt. Manning further testified that he had not compared the Henry's electrical usage with any other residence in the area, because there was no neighboring house within a mile of the residence. Further, he would have wanted to compare it to the electrical usage from a similar property, and there were no residences in the area that were very similar. He did obtain the information from the assessor's office that stated the residence was 1460 square feet heated by gas, and he never obtained any different information.

Sgt. Manning then testified on direct that he estimated he was located between 113 and 125 on the topographical map. He was never in the area between 100 and 105. He could not, however, have been within 10 yards of the structure. He testified he could see the hooded lights hanging on the back wall, where nails were shown in Exhibit 16, which Defendants noted were more than 6 feet from the floor. He also testified he did not disagree that there may have been only one ceiling light. He did testify that he stated in his affidavit he heard sound of a large ventilation fan coming from the roof area, but that statement was erroneous, because the search showed the sound may have been coming instead from the shed or the air compressor. He had looked at his own aerial photos before drafting the affidavit, and conceded the aerial photos did not show a large ventilation fan on the roof. Instead there was a fan found in a little shed that was a cage-type fan and not that loud.

Sgt. Manning testified that he did not feel it necessary to compare the Henry's electrical usage to other properties, and that there were no similar properties in the area, although there were houses on the road to the house, at least a mile away.

Upon cross-examination, Sgt. Manning testified that he was 5'11" tall, and believed he was mostly standing during his observations on the Henry property. He could not remember if he might have knelt briefly. He was using night vision goggles that took binocular vision to monocular. The goggles only show light, not heat, and looking through them was similar to looking at a very small television screen.

Upon re-direct, Sgt. Manning testified that he obtained the electric usage reports "on practically any indoor grow" investigation. He had performed enough to get a sense of when a particular electrical usage was high. He considered over 10,000 k high usage. He also testified he "did not intentionally misrepresent anything" in his affidavit in support of the search warrant.

# IV. Discussion

## A. The Law of the Case

The Government argues that the "Law of the Case" is dispositive of the present motions.

"When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." The purpose of the doctrine is "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing litigation." 18 Wright, Federal Practice and Procedure § 4478, at 788 (1981 ed.). The "law of the case doctrine" will not be enforced when the Court is convinced that its previous ruling is clearly erroneous and would promote an injustice. Arizona v. California, 460 U.S. 618, 460 n. 8 (1982).

Defendants in the pending motion wished to provide new evidence in the form of testimony of an expert, an engineer, along with exhibits created by that expert, as well as the testimony of Defendant Kimberley Henry. The Government did not object to the new evidence or testimony, but reserved its right to call Sgt. Manning to testify.

The undersigned's prior Opinion/Report and Recommendation was rendered in the 2004 case which ultimately ended with an Appellate Court reversal of Defendants' convictions on their conditional guilty pleas and dismissal of the indictment because of technical violations of the Speedy Trial Act. As a result, a new 2008 indictment was returned against the Defendants and a second round of Motions for a Frank's Hearing and to suppress evidence were filed which mirrored the motions filed in the 2004 case.

Considering that the entire first hearing was made by proffer, the undersigned inquired whether the original proffer plus the new testimony and evidence would be considered by the parties

13

to be sufficient for both motions. All three parties agreed that the original proffer and evidence plus the new testimony and evidence would be sufficient. The government additionally conceded that even if the Court agreed the "Law of the Case" controlled in this matter, it would still allow for additional evidence which was not part of the earlier hearing.

Considering that the 2005 hearing was conducted by proffer and the introduction of new evidence during the 2008-2009 hearing may impact the Court's ultimate findings and conclusions, the undersigned concluded that additional evidence would be permitted.

Having received the additional evidence, the undersigned now finds that enough new testimony and evidence was presented for the undersigned to take a fresh look at all of the evidence, including all the evidence presented by proffer during the 2005 hearing.

**B. Entitlement to Franks Hearing**

Defendants move to suppress evidence pursuant to Franks v. Delaware, 438 U.S. 154 (1978). The motion is based in particular on alleged misrepresentations and/or omissions by Sgt. Manning regarding informant Sandy's statements, alleged misrepresentations regarding the surveillance of Defendant's property on March 18, 2004, and misrepresentations regarding the square footage of Defendants' Property that affects the interpretation of the electrical power usage, among others. The United States argues that Defendants have not shown they are entitled to a Franks hearing, and, even if they were, they could not show that Sgt. Manning intentionally or with reckless disregard misrepresented any of material facts in his affidavit in support of the search warrant.

To be entitled to a Franks hearing, a defendant must make a "dual showing . . . which incorporates both a subjective and an objective threshold component." United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990). First, Defendants "must make a substantial preliminary showing

that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Franks, 438 U.S. at 155-156 (quotations omitted). Second, the offending information must be essential to the probable cause determination. If the offending information is excluded and probable cause still remains, no Franks hearing is required. Id. Accord United States v. Friedmann, 210 F.3d 227, 229 (4th Cir.)(purpose of Franks hearing is "to prevent to admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was misled into believing that there existed probable cause"), cert. denied, 531 U.S. 875 (2000). A Franks hearing is not required where neither statements in the affidavit, nor alleged omissions, "operated to defeat the sufficiency of the probable cause showing otherwise made or . . . so seriously undermined [the affiant's] credibility as to render [the probable cause showing] unreliable"), Photogrammetric Data Services, 259 F.3d at 237-238 cert. denied, 122 S. Ct. 1295 (2002); United States v. Akinoye, 185 F.3d 192, 199 (4th Cir. 199)(Franks hearing not required where probable cause existed apart from alleged inconsistencies in affidavit.), cert. denied, 528 U.S. 1177 (2000); United States v. Gray, 47 F.3d 1359, 1364-65 (4th Cir. 1995) (Franks hearing not required absent "substantial preliminary showing" that affiant made knowing and intentional false statements); United States v. Jeffus, 22 F.3d 554, 558 (4th Cir. 1994)(noting Defendant's heavy burden in establishing need for Franks hearing); and United States v. Chavez, 902 F.2d 259, 265 (4th Cir. 1990) (Defendant must show that agent affirmatively tried to mislead magistrate to warrant Franks hearing; ambiguity or lack of clarity is insufficient).

The Fourth Circuit first applied Franks to intentional, material omissions in U.S. v. Colkley, 899 F.2d at 301-302. To successfully attack an affidavit based on omitted information, the defendant must show: (1) that the omission is the product of a deliberate falsehood or of a reckless disregard

for the truth, and (2) inclusion of the omitted information in the affidavit would defeat probable cause. Id. See also Photogrammetric Data Services, 259 F.3d at 237-238. However, as the Court noted in Colkley, all known exculpatory information need not be included in an affidavit, and omission of information is less likely to require a Franks hearing than is the knowing inclusion of false information.

## 1. Sergeant Manning's Surveillance of the Property

Defendants' arguments regarding Sergeant Manning's surveillance of their property in March 2004, are made in the alternative. Generally:

1) Sgt. Manning misrepresented what he observed during the surveillance; or

2) Sgt. Manning misrepresented where he was standing when he made the surveillance and was actually within the curtilage of Defendants' residence, not 20-30 yards away, as he stated in his affidavit.

Defendants base this portion of their motion for suppression pursuant to Franks on paragraph H) of the search warrant application that describes a ground surveillance of Defendant's property by Sgt. Manning on March 18, 2004. Paragraph H) provides, as follows:

At approximately 1:00 a.m. Friday, March 18, 2004, your affiant, S/A L.D. Maxey, and WVSP Sgt. J.M. Garrett conducted surveillance on the Henry residence by walking along the roadway in the area of the residence. There was a light on in the residence and what appeared to be the flickering of a television. There was also a light on in the rear building, which was connected to the residence by the enclosed walkway. Your affiant was able to get within twenty to thirty yards of the rear building by traveling through a wooded and brush covered hillside to the rear of the HENRY residence and connected building. Your affiant was able to see into an approximately eight foot wide by thirty foot long section to the rear (south side) of the building. The remainder of the building was obscured by a wall on the illuminated interior section and there were no windows on the remainder of the visible side (east side) of the building. There were two large hooded type lights visible, hanging from the wall in the illuminated section of the building. There were

two ceiling fans operating in the illuminated section. The was an audible sound from what appeared to be a large ventilation fan coming from the roof area of the building. The outdoor temperature at the time was approximately forty-five degrees Fahrenheit.

Defendants first contend there was no Friday, March 18, 2004, but either a Thursday, March 18, or Friday March 19. The undersigned finds that Defendants are correct. There is either a Thursday, March 18, 2004, or a Friday March 19, 2004, but not a Friday, March 18, 2004. Defendants have not made a substantial preliminary showing that Sgt. Manning made this statement knowingly and intentionally or with reckless disregard for the truth. Franks, 438 U.S. at 155-156. All they have shown is that Sgt. Manning put the wrong date down on his affidavit. That is done countless times daily throughout this country. Further, the undersigned finds the "offending information" is not essential to the probable cause determination.

Defendants next argue that there was no television in the area where Sgt. Manning claimed to have seen "what appeared to be the flickering of a television." Again, even if there was no television in that area, there is no substantial preliminary showing that Sgt. Manning made this statement knowingly and intentionally or with reckless disregard for the truth. In his affidavit, he states it "appeared" to be the flickering of a television.

Defendants' next argument regarding Sgt. Manning's position during the surveillance of their property is as follows:

Given the steep hillside and pitch of the outbuilding roof, a person could not make the observations as outlined in paragraph H) of the search warrant application. This location, 20 to 30 yards from the building on the hillside, would have placed the affiant well above the roof level of the building. From that location, the affiant could not see into the 8' by 32' window section of the building. Any such observations, given the slope of the hill and pitch of the outbuilding roof, would necessarily require the affiant to stand directly in front of this window to make the purported observations. As such, the affiant was clearly on defendants' curtilage while trespassing on defendants' property. Further, there was no "large ventilation fan

17

coming from the roof of the building." Such a device simply does not exist as confirmed by the ariel [sic] photograph taken by the police several weeks earlier. As such, all the information in paragraph H) should be redacted from the affidavit in support of a thermal imaging search.

The same argument was made at the time of the first motion to suppress in the 2004 case. Defense counsel in that case argued "it appears to us that the descriptions of the contents of the building given by Trooper Manning could only have been obtained if he, in essence, had pressed his nose to the window, either of the door or one of the windows on the side of the building in order to view what was inside and then retreated, and then described in his affidavit what- - what he couldn't see from that point . . . . The greater issue, again, is what- - what could be seen from the point at which Trooper Manning says that he observed the interior of the home."

The evidence produced by Defendants at the 2004-2005 hearing consisted for the most part of photographs taken by Defendant Kimberley Henry. Counsel contended that a photograph taken by Mrs. Henry showed what could be observed from the location at which Sgt. Manning said he was standing.

There is no dispute that there was, and is, an upward slope from the rear of the building into the woods. The 2004-2005 photo, allegedly taken from the point where Sgt. Manning would have been standing, indicated that one would be above the level of the roof of the shop, so that, looking through the windows from that location, one could not see items located on the ceiling such as lights, ceiling fans, etc.

During the 2005 hearing the undersigned inquired, and counsel agreed, that it would depend on where the photographer was standing versus where Mr. Manning may have been standing as to what can be seen inside of the outbuilding. The undersigned then stated:

So if a person is standing even with the windows, they see what's available to be seen through the lens of the photograph at that level. If they see or were standing down hill, then at the time of looking, which the eyes see the same thing the lens of the photograph see, they would see, on an angle up and into the building. My point being, it would depend on where on the topography someone may have been standing at the time of the observation versus where they were standing at the time of the taking of the photograph. Are you in a position - - is your client in a position to tell me that they knew where Trooper Manning was in fact standing, and took the photograph from the same exact point relative to the observations in paragraph H of the Manning affidavit versus photograph No. 3?

Counsel replied:

The answer to your question is, no, they– they don't know precisely where Trooper Manning was standing. The - - the point of these photographs is to show that - - and again, you know, as we talk about the contents of photographs, it's always difficult to - - to be sure that we're referring to the same things. But the- - the photographer of Exhibit No. 3 was standing on the hillside that is exhibited in photograph 2A. That hillside is, extends the entire length of the building so that for a person to come within 20 to 30 yards of that wall of that building, one would have to be standing on this hillside above the building. This photograph being taken from 56 feet is to show that at 56 feet, a person is actually above the roof line of this shop area. And looking at an angle downward into the windows, just as the Court observed earlier.

Later, Counsel argued:

So, in other words, if one were outside of the shop, this area of the building, up on the hillside 20 to 30 yards and peering in through the windows, not only would you not be able to see level with the ceiling in that shop, the ceiling fan and the shop lights that we referred to earlier as the hooded lights, those items, the lights, the ceiling fan are located along the portion of the - - the roof line that is highest in relation to the windows.

The undersigned responded:

Well, two things. That would depend on what level the person was standing outside of the building at the time they made the observation that they noted in H of the Manning affidavit. And if that's so, then how would you explain that Trooper Manning reports that he saw ceiling fans, albeit two of them, and in fact there are ceiling - - there is at least a ceiling fan in your photographs?

Counsel:

I– I would explain that by saying that he, contrary to his assertion that he got within 20 to 30 yards of the wall, he got to within 20 to 30 inches of the wall or the door in order to see into the interior of the shop. And while 20 to 30 yards from the back of the building in that location might, arguably, I won't concede it, but might arguably not be part of the curtiledge [sic] on that steep, brushy hillside, 20 to 30 inches from the wall certainly, I would argue, is withing [sic] the curtiledge [sic]/ If - - if one is, if one looks at photograph 4B, if as it appears in that photograph, that you are standing level, the view is - - is straight through the building, then the roof line sloped from the right where the light and ceiling fan are located on the roof, on the ceiling, downward to the wall where the windows are. If you extend that angle, if you extend that line from the ceiling and roof beyond the windows, beyond the wall, out to the ground, then in order to see the ceiling fan and see the light from the outside, one would have to be standing on the ground within the angle created by extending that roof line out to the ground. Since the - - the ground on the window side of that building is a hillside that slopes upward, as one can observe, quite steeply, there is no way one could be standing 20 to 30 yards on that hillside and look in through those windows and see a ceiling fan and light attached to the ceiling in that shop area s where they are, obviously, attached.

Undersigned:

Assume for the moment the 20 or 30 inches from the window. Is there a space between 20 and 30 inches and 20 to 30 yards in which the curtiledge [sic], by law, ceases to exist and is no longer an issue?

Counsel:

The - - I - - I think that the law with respect to the curtiledge [sic], I'm sure, Your Honor, is well aware, probably better acquainted with this than I. It – it – it's a matter of interpretation.

Undersigned:

Did they have, did - - did the brush grow right up to the back of this building?

Counsel:

No.

Undersigned:

How far did the brush go to this building?

Counsel:

     About six, seven, perhaps, eight feet.

Undersigned:

     So beyond six or seven feet to eight feet, there's uncontrolled brush. Is that a true or accurate statement?

     . . . .

Counsel:

     As one looks down towards the windows, in front of the windows as you – as you come up the hillside, you can see where the, the brush and the trees are, and then there's a - - there appears to be like a straight line running horizontal or almost horizontal. At that point, the ground fall away again. There's almost like a little - - like a little cliff, maybe two or three feet in height. And from that point is where the - - the brush is kept clear.

Undersigned:

     It's now marked in blue, an elongated circle area, and it appears to be a rock cliff. And in the foreground between the photographer and where that cliff starts, would be an area of ground falling away, correct?

Counsel:

     Correct.

Undersigned:

     And it would be the Henries' [sic] testimony that it is beyond that rock cliff that the more flat ground appears?

Counsel:
     Correct.

Undersigned:

     And that flat - - more - - more flat ground, not completely flat ground, but more flat ground extends from the rock cliff to the building?

Counsel:

>That's right.

Undersigned:

>How far of a distance is that from the rock cliff to the building, approximately?

Counsel:

>Six or seven feet.

Undersigned:

>That would be the same area that you've just described as being more free of brush than in the area in the foreground?

Counsel:

>That area is kept completely free of brush.

Subsequently, AUSA Morgan stated:

>The Government would proffer that Trooper Manning remained in the brushy-wooded area as he indicated, 20 to 30 yards from the rear south portion of the outbuilding or th - - the section that he viewed, as listed in the affidavit. From that location, it's the Government's position he's not within the curtilegde [sic]. And what he sees, he should be reporting to you as he did in paragraph H.

As discussed in the facts section of this opinion, Mr. Smith, the engineer, opined during the 2008 hearing that it would have been impossible for Sgt. Manning to see the ceiling fan from a vantage point 20-30 yards from the structure. He also opined that, from that vantage point, one could not see more than 5 ½ feet (at absolute maximum) up the rear interior wall. Mr. Smith, accepted as an expert in land surveying and engineering, opined that one would need to be within 10 yards to even possibly see the ceiling fan. He also testified that he performed an unscientific experiment that showed that from the ceiling fan, one could not see even seven or eight feet up the hillside.

If the undersigned determines that Sgt. Manning was indeed within the curtilage at the time he observed the items described in H, the Government argued at first hearing and now renews its argument that the outbuilding was not protected area at all, and was therefore not curtilage, because "it's the government's position, that they are not entitled by law to claim such an interest in that building because of the use to which the property was made. The undersigned rejected then and does now reject this "end justifies the means" argument.

The undersigned finds, based upon the original proffer in conjunction with the new evidence and testimony, that Sgt. Manning must have been much closer than 20-30 yards from the structure to observe what he stated he observed in paragraph H of the affidavit in support of a search warrant. The undersigned also finds that in order to have observed the ceiling fan and hooded lights, Sgt. Manning must have been in or very near the maintained portion of the property which started at about 8 feet of the back of the outbuilding.

The first step of <u>Franks</u>, however, requires the undersigned to determine whether this misrepresentation was made knowingly and intentionally or with reckless disregard for the truth. Based on a totality of the evidence and the demeanor of the witness during the hearing, the undersigned does not conclude that Sgt. Manning knowingly and intentionally or with reckless disregard for the truth misrepresented where he was standing when he made the observations he reported in paragraph H of the affidavit. The undersigned rejects the proposition that Sgt. Manning was within inches of the window or door, looked inside and then intentionally reported he was 20 to 30 yards out when he saw the fan and lights reported in paragraph H. The evidence is insufficient to support a preponderant finding to that effect. At the time of those observations it was dark; he was wearing night vision goggles; did not take measurements; was trying to avoid detection by dogs

23

he suspected could be in the area; was negotiating strange territory for the first time. In addition, no one 3 to 4 years after the search can pin point where on the Henry property Sgt. Manning was when he made the observations in question. At worst, Sgt. Manning is simply stubbornly wrong when he says in his affidavit and testimony that he was 20 to 30 yards out when he made the observations.

Mr. Smith, the surveyor, conceded Sgt. Manning could have seen what he said he saw if he was between 8 and 10 feet from the back of the building and bent down looking up. Smith's assertion is supported by "Defendant's Exhibit 5 - Line of Sight-A" at a position between the 0+10 and 0+20 position and Defendant's Exhibit 4 which show that a person bent close to the ground at approximately 14-15 feet from the rear of the building could see on a horizontal to slightly upward line of sight the fan which was in the direct line of sight through the window from Line -A. Those same exhibits coupled with Government's Exhibit 2 and Defendants Exhibit 3 Interior Wall and picture 5 of Defendant's Exhibit 1 show it was also possible for Sgt. Manning to have seen the two lights from the area where he was standing when he saw the fan by simply looking at an angle through the window depicted at intersection with line of sight A to the back wall. Furthermore, Defendants Exhibit 2 coupled with photos 1, 2, and 3 of Defendant's Exhibit 1 show the location of brush and that in the winter months one can see the back of the building and its windows clearly through the brush. Those same photographs also show a declining grade running downhill from the South East corner to the South West corner (line of sight A area) of the South wall of the building in question.

The undersigned finds by a preponderance of all the evidence presented that Sgt. Manning was much closer than the 20 to 30 yards he claimed to have been standing, but was not within the curtilage of the Henry property when he saw what he substantially reported seeing in paragraph H

of the affidavit. There is no doubt that Sgt. Manning saw the two lights. They were on site at the time of the later physical search of the property. Although he did not see two ceiling fans as stated in the affidavit, he did see one such fan. During his Second Hearing testimony he conceded that in walking with the night vision goggles he may have thought he saw two ceiling fans when he actually saw only one. Nonetheless, at the time of the later physical search, one ceiling fan was present confirming the presence of one of the two fans reported in paragraph H. For the reasons stated herein, the undersigned concludes from a totality of the evidence that Sgt. Manning did not intentionally misrepresent where he was standing when he made his observations. The undersigned further concludes from a totality of the evidence that Sgt. Manning's statements where he was standing when he made his observations were not made in reckless disregard for the truth. United States v. Jeffus, *Supra* at 558.

As for the audible sound from what appeared to be a large ventilation fan coming from the roof area of the building, the undersigned finds that there is no intentional misrepresentation nor is there any a misrepresentation in reckless disregard for the truth. He averred he heard an audible sound. He further averred that the sound was from what appeared to be a large ventilation fan. He averred the sound was coming from the roof. He did not aver he saw such a ventilation fan. It was dark. In the dark it is difficult to know with any certainty the location of the sound. Kimberly Henry does not know if the generator and or fans depicted in Government Exhibit 5 were running on that particular night in July. It cannot be disputed that there is no vent fan in the roof of the building. The undersigned does not consider the fact that ariel surveillance photos which Sgt. Manning had at his disposal and looked at prior to seeking the warrant and which showed the roof and no ventilation fan as indicative that Manning intentionally misrepresented a fact or was reckless in his

averment. There is no evidence that he intentionally disregarded those photographs when he prepared paragraph H of his affidavit. There is evidence that he was negligent in not connecting that the photographs did not show a ventilation in the roof with the statement he made in paragraph H of his affidavit. In hindsight, the absence of the vent in the photographs could have raised a question in Sgt. Manning's mind as to the actual origin of the sound he heard. However, the evidence does not establish reckless or intentional omission.

The second step of the <u>Franks</u> analysis states the offending information must be essential to the probable cause determination. If the offending information is excluded and probable cause still remains, no <u>Franks</u> hearing is required. <u>Id.</u> The undersigned further concludes from a totality of the evidence including but not limited to a further review of the affidavit in question that, even if Sgt. Manning's averments in paragraph H of the affidavit were stripped therefrom because it was found he knowingly and intentionally or with reckless disregard for the truth misrepresented he was standing 20-30 yards out when he was actually standing within 8 to 14 or so feet of the rear of the building: 1) his overall credibility is not undermined; and 2) sufficient probable cause for the issuance of the Kyllo search warrant still existed from the remaining averments in the affidavit as is hereinafter explained.

### 2. Sandy Information

Defendants assert the actual handwritten statement by Philip Sandy refutes or at least is inconsistent with the affidavit's assertions regarding what Sandy said. The Court notes that Sgt. Manning's affidavit relates what he says was told by Tpr. Yanero regarding what Sandy said in the interview. It is a fact that Sgt. Manning did not himself interview Sandy, and it is also a fact that the Yanero/Sandy interview took place in November 2002, while the Manning affidavit was not written

until July 2004. The Sandy written statement says nothing about the quality of the marijuana Sandy purchased; the affidavit states that Sandy said he bought marijuana four to five times where his own statement says he bought it three to four times; the affidavit states that Sandy said the Henry's built a building behind their residence specifically for growing marijuana, while Sandy's written statement says nothing about that; and the written statement says that Sandy saw a total of three ounces of marijuana at the Henry's, and apparently had not actually seen a marijuana grow operation. The affidavit also states that Sandy told Sgt. Yanero that the Henry's moved to West Virginia from the D.C. area, that Kim Henry had some type of internet-based business, and that she had worked for the IRS. Yet none of these facts appear in Sandy's own written statement, and Defendants argue that they are untrue.

The Government argues and the undersigned agrees, that Sgt. Manning's affidavit relates what he says was told by Tpr. Yanero regarding what Sandy said in the interview. It does not purport to relate what was in Sandy's written statement. It also does not matter that Sgt. Manning had a copy of the Sandy statement because there is no evidence he referred to it in the preparation of the affidavit in question.

The undersigned concludes there is no evidence that Manning intentionally misrepresented a fact or was reckless in his averment in the 2004 search warrant affidavit with regard to what he was told by Sgt. Yanero concerning the 2002 Sandy interviews.

### 3. Square Footage and Electricity Usage

Defendants argue that paragraph N) of Sgt. Manning's affidavit misrepresents by understating the actual square footage of their property by more than half. Sergeant Manning's affidavit expressly states:

Records obtained from the Gilmer County, WV Assessor's office indicate that the Edgar C. and Kimberley C. HENRY residence, having an address of P.O. Box 67 Rosedale, WV has a living area square footage of 1,460. The Assessor's office records further indicated the residence has a total of five rooms, three of which are listed as bedrooms, and that the residence is heated by gas.

Defendants do not dispute that the assessor's office records state their residence totaled 1,460 square feet of living area or that it is heated by gas. Defendants do argue, however, that Sergeant Manning knew or should have known the total square footage was well over 1,460, and was, in fact over 3,000 square feet, because he knew of the attached building and clearly observed the two attached buildings. His misrepresentation of the square footage was made at minimum with reckless disregard for the truth.

The undersigned does not find that Sgt. Manning actually recognized the buildings totaled more than twice the 1460 square footage listed in the assessor's records and withheld that information from the undersigned at the time of the probable cause determination. Manning testified he looked at the assessor's public records in this case as he did in all other suspected indoor marijuana grow cases. He accurately reported the square footage from the assessor's records. Defendants would have Manning second guess the public record and compare his own estimate of square footage to the electric records he subpoenaed from the power company to determine whether power usage was consistent with the size of the total buildings. Not only would that have required Manning to speculate on the size of the second building, but it would have required him to speculate on the electric usage within that building as well as the primary dwelling. Defendants have not made a substantial preliminary showing that he made a false statement knowingly and intentionally or with reckless disregard for the truth. Franks, 438 U.S. at 155-156.

For all the above reasons, the undersigned finds Defendants have not met their burden under Franks of showing that "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Franks, 438 U.S. at 155-156 (quotations omitted). The undersigned, therefore, finds no Franks hearing is required

## 4. Additional Franks Arguments

Additionally, although Defendants did not emphasize the following alleged misrepresentations or omissions contained in the affidavit, they argue that when considered all together, they show at least a reckless disregard for the truth:

Paragraph 3: Sgt. Manning states that he has received training in and is certified in the usage of thermal imaging devices. He does not, however, state that he is certified or trained in interpreting the results of a thermal imaging scan.

Paragraph 4: Sgt. Manning states: "I am familiar with the distinct odor emitted by growing marijuana and have seized and taken into evidence thousands of growing marijuana plants. Sgt. Manning, however, did not state that there was such a "distinct odor" at the Henrys' residence, and, in fact, there is no evidence that there was any odor of marijuana. He also never saw any marijuana plants or even marijuana.

Paragraph 5: Sgt. Manning states: "I know that persons who operate indoor marijuana cultivation and propagation operations routinely utilize the following items and methods, among others, in their attempts to avoid detection from law enforcement authorities:

A) Use of blackened out or covered doors or other visible areas to prevent subjects

. . . from identifying any portion of the grow operation . . . .

B) Use of fixed, movable, or other type venting systems, usually located away from detection or upon high areas of buildings, to vent heat and odors escaping from the cultivation structure.

C) Use of fictitious names on utility records and/or fictitious business names associated with the suspects' property.

D) Alteration of the electrical system on the property by bypassing the utility meter, so that the excess usage of power caused by the indoor lighting equipment does not register with the utility company.

E) Use of deodorizers to mask the odor of growing marijuana that is emitted from the venting system.

Sgt. Manning omits from his affidavit, however, any mention that none of the above evidence was found at Defendants' property.

Paragraph 6:   Sgt. Manning states: "The growing process results in release of an odor, and the odor associated with growing marijuana is a "skunk" or a "pungent sweet musty" smell.

Again, Defendants assert that Sgt. Manning omitted any mention that there was no such odor at Defendants' property.

The undersigned does not find any of these omissions to be the product of deliberate falsehood or of a reckless disregard for the truth. Given the strength of the affidavit as a whole, the undersigned further concludes that the inclusion of the omitted information would not defeat probable cause. <u>United States v. Colkey</u>, *Supra* at 301-302.

## C. Motion to Suppress

### 1. Contentions of the Parties

Regarding their Motion to Suppress, Defendants contend:

1)      The search warrant application at issue was not submitted and signed by the issuing judge until July 13, 2004, thus undercutting much of the information provided by the police informant, Philip Sandy, as contained in the warrant application.

2)      The police provided absolutely no information on which to evaluate Sandy's credibility.

3)      The "anonymous source" who provided the police with information in September 2003, was unidentified and the affidavit provided no information to establish basis of knowledge.

4)      Matters affecting the third "confidential source['s]" basis of knowledge and veracity are also completely lacking.

5)      The affidavits list Edgar Henry's drug-related arrests in 1972 and 1993, in Maryland, but no information was provided regarding disposition of the cases.  The May 8, 2004 arrest indicates only that Edgar Henry was found in possession of a small quantity of marijuana, but there is no information concerning how he supposedly obtained it.

6)      Arial and ground surveillance of the property simply established that the Henrys had a 77-acre farm with a residence and attached building as described earlier by Sandy.[6]

7)      No steps were taken by police to compare the Henrys' billing records with those of other nearby farms to determine whether such usage was irregularly high.  Further, the probative value of electrical consumption billing records is suspect.

_____

[6]By separate motion, based on Franks v. Delaware, the defendants claim that the police inspection of their outbuilding necessarily required the police to violate the privacy interests associated with defendants' curtilage.

8) The good faith exception to the exclusionary rule does not apply in this case. <u>United States v. Leon</u>, 468 U.S. 897 (1984), "as the warrant affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

## 2. Relevant Law

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." <u>United States v. Wilhelm</u>, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." <u>Payton v. New York</u>, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) <u>quoting</u> <u>United States v. United States District Court</u>, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." <u>Silverman v. United States</u>, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." There is probable cause to search a home if there is a fair probability that evidence of a crime is located within the residence. <u>See</u> <u>United States v. Murphy</u>, 241 F.3d 447, 457 (6th Cir. 2001). Whether probable cause exists must be determined "under the totality of the circumstances." <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213 (1983).

"[P]roblble cause is a fluid concept - - turning on the assessment of probabilities in particular

factual contexts - - not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.

In a review of an issued search warrant, "great deference" is given to the issuing judicial officer's probable cause determination. United States v. Blackwood, 913 F.2d139, 142 (4th Cir. 1990). The test on review is whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). To that end, the reviewing court does not conduct a *de novo* review but instead limits itself to the information presented to the magistrate who issued the warrant. Id. See also United States v. Wilhelm, 80 F. 3d. 116, 118 (4th Cir. 1996).

The determination of whether the undersigned United States Magistrate Judge had probable cause to issue the warrant to search is made by answering the question: From a totality of the circumstances presented to the issuing judge, was there "a fair probability that contraband or evidence of a crime" would be found in the residence and attached building? Illinois v. Gates, *Supra* at 238.

### 3. Analysis

#### a. Sandy Information

Defendants first argue that the search warrant application was not submitted until July 13, 2004, 20 months after Sandy was interviewed by police. At the time Sandy told police he had "purchased small quantities of high quality marijuana from Kimberly HENRY on four to five occasions in the past" and "that Kimberley and Edgar "Chip" HENRY had built a building behind their residence specifically for growing indoor marijuana." Defendants argue that the information

33

provided by Sandy was stale. Additionally, Sandy never said how long before the interviews the alleged buys took place, adding to the staleness of that information. As already discussed, Sandy never said he saw any evidence of a growing operation at Defendants' house, and saw a total of perhaps three ounces of marijuana at their residence. Defendants argue that the evidence is particularly stale, because Sandy saw only evidence of possession years before the affidavit was written, and not manufacturing.

"[T]ime is a crucial element of probable cause. A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." United States v. McCall, 740 F.2d 1331, 1335-1336 (4th Cir. 1984). "[T]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit....Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the lenght of the activity, and the nature of the property to be seized." Id. at 1336.

Isolated, the Sandy statement is stale and insufficient to support probable cause. However, when coupled with the anonymous tip of a large indoor marijuana grow at the Henry's in September 2003 (Paragraph A); Edgar Henry's criminal history of drug related arrests in 1972 and 1993 (Paragraph D) and his May 8, 2004 Braxton County, West Virginia arrest for possession of marijuana (Paragraph I); with a report from Deputy Sheriff Moss that he had received information from a confidential source over the past four years that the Henrys had been growing and distributing marijuana in the Rosedale area (Paragraph L) a continuim of marijuana drug activity including reported growing of marijuana is shown from Sandy's 2002 statement through to shortly before

34

issuance of the warrant at issue.

Defendants further argue regarding Sandy that he did not provide any information to police about where the buys took place or any information regarding his basis of knowledge for the claim that the marijuana grow existed at the Henry's residence. As Defendants correctly state, Sandy did not say he personally observed the indoor marijuana grow, and his claim could therefore "very well be based on unsubstantiated hearsay." However, the fact that Sandy was admitting to crimes (obtaining marijuana) and providing information in the hope of leniency from the police investigating him on charges that he failed to register as a sex offender provides "indicia of reliability" of the information he was providing. United States v. Harris, 403 U.S. 573, 583 (1971), United States v. Miller, 925 F.2d 695, 698 (4th Cir. 1991). In Miller, the informant had not been used by the officer before such that her reliability had been tested, and the informant's motive was to gain a favorable recommendation to the Court in her own case. In reversing the District Court's suppression of the evidence taken as a result of the subsequent search in Miller, the Fourth Circuit held: "In assessing whether an officer acting on an informant's tip has probable cause, we look to the 'totality of the circumstances' surrounding the information available to the officer." Illinois v. Gates, Supra at 213.

Finally, Defendants argue that the affidavit provides "absolutely no information on which to evaluate Sandy's credibility." It notes that Sandy's cooperation lasted only until he was released from jail, for failing to register as a convicted sex offender. The undersigned disagrees. It is not necessary that the criminal conduct attributed by Sandy to the Henrys be corroborated. Corroboration of innocent facts may be sufficient. Alabama v. White, 496 U.S. 325, 331-332 (1990;

<u>Gates</u>, Supra at 243-244; and <u>Unitd States v. Lalor</u>, 996 F.2d 1578, 1581 (4th Cir. 1993). Sandy said the grow operation was located in a building behind the Henry residence that they built for that purpose. That statement is supported by the anonymous source in paragraph A the confidential source in paragraph L. The assertion that the Henrys moved from Washington D.C is supported by the criminal history checks in Paragraphs D and F noting drug related arrests of Mr. Henry in Rockville Maryland and Pikeville Maryland. The hand drawn map Sandy provided in 2002 matched what the officers saw during the February 23, 2004 arial surveillance of the Henry property (paragraph G) clearly indicating that Sandy had been to the Henry residence prior to drawing the map.

### b. Anonymous Source Information

Defendants further contend the police attempted to bolster Sandy's deficiencies through the use of "an anonymous source"' who provided the police with information in September, 2003, almost a year before the affidavit was submitted, that the Henry's had a large indoor marijuana grow operation at their residence. Defendants argue that, besides being unidentified, this source also provided no information to establish basis of knowledge. There was no corroboration of this source's information except he/she claimed the Henry's were from New Jersey, and Kimberley Henry's social security number indicated she may have been from New Jersey. Defendants contend that Kimberley Henry did indeed obtain her social security card in New Jersey, but had not lived there since 1970.

Defendants next contend that the information from a third confidential source, who told

police that the Henry's "have been growing and distributing marijuana . . . for the past four years" also indicates no basis of knowledge or veracity.

On the whole, Defendants argue, none of the three "sources" was established as a reliable source; the information provided was lacking in detail with respect to specifics regarding the illegal operation allegedly conducted by Defendants; and the information did not approach the detail sufficient to establish basis of knowledge or the credibility of those providing such information.

As with Defendants' complaint that Sandy's information was unsupported hearsay, the complaint that the anonymous tipsters' information should be dismissed as unreliable hearsay is without merit. Generally speaking, an affidavit in support of a search warrant may be based in whole or in part on hearsay information so long as there are sufficient indicia of reliability. United States v. Ventresca, 380 U.S. 102, 103 (1965) and United States v. Chavez, 902, F.2d 259, 265 (4th Cir. 1990).

In determining whether an informant's tip establishes probable cause, the undersigned must look to the degree which the arresting officer can corroborate that tip. The cases do not require that police officers acting on an informant's tip must corroborate that tip in any specific way such as conducting an independent investigation. In fact, corroboration of "innocent facts" provided by an informant may be sufficient as it is not necessary that there be corroboration of the criminal conduct itself. Alabama v. White, 496 U.S. 325, 331-332 (1990) and Illinois v. Gates, *Supra* at 243-244

In the present case, Trooper Manning stated in his affidavit that Sandy was incarcerated and also admitted that Sandy's cooperation ended upon his release from prison. He also noted that Sandy

stated the Henrys were from the Washington, D.C., area, which was corroborated by Edgar Henry's record of arrests in the Washington, D.C., and Baltimore areas. He also noted that Sandy provided a hand-drawn map and description of the Henrys' residence, which appeared to match the Henrys' residence. As remote as the residence is, it is highly unlikely that Sandy could have drawn an accurate map without having been there at least several times. This corroborates his statement that he had been to the Henrys' residence, where he had smoked marijuana with Kimberly Henry on several occasions.

### c. Edgar Henry's arrest record

Defendants next argue that Edgar Henry's arrest record does not state he had any conviction, only the arrests. Further, the first arrest was approximately 37 years ago and the second was 16 years ago. The affidavit states only that the 1972 arrest was "drug related" and the 1993 arrest was for possession of a small quantity of marijuana. During a 2004 arrest, Edgar Henry was found only to be in possession of a small quantity of marijuana. While, there is no indication where Edgar Henry supposedly obtained the marijuana, the arrest and discovery of the marijuana provides the undersigned with a continuum of drug (marijuana) activity leading up to the issuance of the search warrant at issue. "An officer's report in his affidavit of the target's prior criminal activity or record is clearly material to the probable cause determination." United States v. Bynum, 293 F.3d, 192, 197-198 (4th Cir. 2002) The officer's knowledge that Henry had been involved in illegal narcotics in the past coupled with his knowledge of the more recent narcotics arrest, corroborates the annymouns and confidential sources of information and Sandy's dated information. United States v. Miller, Supra at 699-700.

### d. Aerial and Ground Surveillance of the Property

Defendants next argue that the aerial and ground surveillance of their property "simply established that [they] had a 77-acre farm with a residence and attached building as described earlier by Sandy," and could not be considered substantial enough to corroborate the earlier tips from Sandy, the anonymous source or the confidential source.[7] Further, Defendants argue that photos taken from the air show no ventilation fan. Sgt. Manning was in possession of these photos before writing his affidavit stating he heard the sound of a large ventilation fan from the roof area of the building.

Defendants also argue there was no television in the area where Sgt. Manning stated he saw the flickering that appeared to be from a television set.

Defendants also argue, as already discussed, that Sgt. Manning misrepresented either where he stood when he observed the building or misrepresented what he saw from his observation point. Defendants presented expert testimony and evidence based on the sworn affidavit and the Government's prior proffer that Sgt. Manning was standing between 20 and 30 yards from the building, arguing that he could not possibly have seen what he said he saw from that far away, and that, if he did see those items, he must have been within the curtilage of the residence at the time. Despite the sworn affidavit and the Government's proffer, the testimony and argument from the Government at this hearing was that Sgt. Manning could actually have been closer than 20-30 yards.

---

[7]As noted earlier, Defendants have filed a <u>Franks v. Delaware</u> motion claiming that the police inspection of their outbuilding necessarily required the police to violate the curtilage of their property.

Regardless, Defendants argue that Sgt. Manning could not possibly have seen what he said he saw, while standing behind the brush, on the hillside behind the residence. In particular, the ceiling fan could not have been seen even from a distance of 10 feet or so.

Searches of areas which are arguably within "the curtilage" of a home raise reasonable expectation of privacy issues. See, e.g., United States v. Dunn, 480 U.S. 294 (1987) (Instructing that "curtilage questions should be resolved with particular reference to four factors: the proximity [to the home], whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by"); Oliver v. United States, 466 U.S. 170 (1984)( explaining that "only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home" and United States v. Breza, 308 F.3d 430 (applying Dunn factors, separately fenced garden approximately 50 feet from house, which was used to grow marijuana, not within curtilage of defendant's home.

The undersigned notes that Breza involved an aerial surveillance of a property. It is further distinguishable from the present case because it involved a separately fenced garden area 50 feet from the home, whereas the building at issue here was actually attached to the living area of the Defendants' property. The undersigned finds that the building in this case was therefore in close proximity to the living quarters. Although there was no man-made enclosure apparent, the building was in a natural "enclosure" below a hill, separated from woods by brush. It is clear that the building was not "plainly visible from outside walkway or front porch." However, the photographs show that the maintained area below the 2 to 3 foot sloped bank piches off to a very small strip at the left rear

40

corner of the building (viewed facing the building from the woods). This means there was minimal area behind the building that would have appeared to be maintained. The <u>Dunn</u> factors are only met with regard to the very narrow area of flat walking space behind the building which virtually pinches off at the left corner of the building. However, the undersigned has already considered all of this and concluded that Sgt. Manning was not within the curtilage when he made the observations reported in paragraph H.

### e. Power Records

Defendants next argue that the electrical billing records indicated an average bill for a 60-day period of $728.09, but did not provide any comparison between the Defendant's records and those of other nearby farms to determine whether their usage was irregularly high. Further, Defendants argue that the probative value of electric consumption billing records is suspect, citing <u>U.S. v.Clark</u>, 31 F.3d 831 (9th Cir. 1994). In <u>Clark</u>, another marijuana-cultivation case, the defendant, a resident of Alaska, had monthly electric bills upward to almost $400.00. Further, the bills did not decline during the summer months when normal residential usage (in Alaska) falls. Finally, as in this case, the affidavit reported that Clark had alternative heat sources, such as propane and fuel oil tanks, "implying that electricity was being used for some purpose other than household heating." The Ninth Circuit found the affidavit "barren, however, of any information about the average residential electric consumption of homes in rural Alaska or other homes in the vicinity. In short, it provides no basis for a magistrate judge or this court to evaluate whether the usage was high. Even assuming, however, that Clark's electrical consumption was 'high, such consumption is consistent with numerous entirely legal activities."

This argument is yet another example of Defendants separating out each and every factual assertion and holding it up to close scrutiny while ignoring the role it plays when viewing all of the parts together under the totality of circumstances rule.

The determination of whether the undersigned Magistrate Judge had probable cause to issue the warrant to search Defendants' residence is made by answering the question: From a totality of the circumstances presented to the issuing magistrate, was there "a fair probability that contraband or evidence of a crime" would be found in the house? Illinois v. Gates, 462 U.S. 213, 238 (1983).

According to the Fourth Circuit, it is not necessary that the officials "possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause." Taylor v. Farmer, 13 F.3d 117, 121-122 (4th Cir. 1993).

Based on all of the above, as well as the additional evidence contained in the affidavits, the undersigned finds substantial evidence in the record supporting the decision to issue the warrants. Massachusetts v. Upton, 466 U.S. 727, 728 (1984). [8]

---

[8]In support of the second search warrant, Trooper Manning stated the same facts as listed above, plus the following:

A) On July 16, 2004, he, West Virginia State Police Sgt. Mike Garrett, and Special Agent Kenneth Winkie traveled to Defendants' residence to conduct surveillance. Special Agent Winkie remained with the vehicle while Trooper Manning and Sgt. Garrett traveled on foot along

## D. Leon Exception

The Government argues that, even if the information in the affidavit were found to be insufficient for a finding of probable cause to issue a search warrant, the evidence seized in the second search should not be suppressed pursuant to the "good faith exception" stated in U.S. v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 677 (1984). Defendants argue that Leon does not

---

Secondary Route 14/6 to the area of the Henrys' residence. At approximately 2:30 a.m,. they were in a position to conduct visual surveillance of the residence. The interior lights were turned off and no signs of activity were detected. It was noticed that an air conditioning unit located on the east wall of the rear attached building was running. The temperature in the area at that time was 58 degrees F. The air conditioning unit did not shut off during the thirty-minute time frame Trooper Manning and Sgt. Garret were at the scene. The air conditioning unit was located in the area previously described by Sandy as being built specifically for growing indoor marijuana. It was observed that an air conditioning unit located on the east wall of what was believed to be the residence portion of the structure did not appear to run during the same time period. It was also noted that a large dog was located just to the east side of the attached rear building, preventing closer access and surveillance through the wooded section to the south side of the residence;

B) Trooper Manning and Sgt. Garrett traveled to the west side of the residence along Secondary Route 14/6. Using light intensifying night vision goggles, they observed light escaping from the area of the attached rear building. The light appeared to be coming from the top area of what appeared to be a garage door or large doorway on the west side of the building;

C) Manning and Garrett also observed the residence and attached building with a thermal imaging unit pursuant to the first search warrant issued by the undersigned. The thermal imaging unit indicated a higher amount of heat being emitted from the attached rear building of the residence. The thermal imaging unit indicated that most of the rear attached building was insulated; however, the lower section and the south wall did not appear to be insulated, and the heat radiating through those areas was much greater than the remainder of the residence. The thermal imaging unit also indicated a large amount of heat being emitted from the air conditioning unit located on the east side of the rear portion of the building.

The undersigned United States Magistrate Judge issued the second search warrant based on the above.

apply because the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unseasonable. Defendants argue that the affidavit is "bare bones," lacking objective facts to support a probable cause finding, especially considering the minimal corroboration of Sandy's and the anonymous informants' information. Additionally, if Sgt. Manning misrepresented any of the information in an attempt to mislead the undersigned, he could not have harbored an objectively reasonable belief in the existence of probable cause.

The exclusionary rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). In Leon, the Supreme Court explained the reason for rule:

> First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate.

Leon at 915, 104 S. Ct. at 3417. Further:

> If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

Id. at 918, 104 S. Ct. 3 at 3419. The Supreme Court concluded:

> [T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.

44

Id. at 922, 104 S. Ct. at 3420. Therefore, the question of whether the good faith exception to the exclusionary rule should be applied to suppress evidence, depends on whether suppression of the evidence would have the desired effect of deterring police misconduct. In most cases, "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . . there is no police illegality and thus nothing to deter." Id. at 920-21, 104 S. Ct. at 3419.

The Fourth Circuit followed the Supreme Court's line of reasoning in United States v. Lalor:

> Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

996 F.2d 1578 (4th Cir. 1993). Accord United States v. Bynum, 293 F.3d 192, 197-199 (4th Cir. 2002) (applying good faith exception where "affidavit contained sufficient indicia of probable cause so as not to render reliance on it totally unreasonable," reversing district court's suppression of evidence); and United States v. Cluchette, 24 F.3d 577 (4th Cir. 1994) (applying good faith exception to search warrant issued by state judge over telephone, declining to determine whether warrant was valid under state law.) In other words, the good faith exception applies unless "a reasonably well-trained officer . . . [should] have known that the search was illegal despite the magistrate's authorization." Leon, 468 U.S. at 922 n.23.

The Fourth Circuit has noted "four situations in which an officer's reliance on a search warrant would not be reasonable," and the good faith exception would therefore not apply:

> (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the

truth;

(2) the magistrate wholly abandoned his detached and neutral judicial role;

(3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

(4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

United States v. Hyppolite, 65 F.3d 1151, 1156 (4th Cir. 1995), quoting Leon, 468 U.S. at 923.

Defendants have not presented any evidence that the undersigned issuing Magistrate Judge "wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319 (1979)." U.S. v. Leon, 468 U.S. 897.   Regarding the actions of the Town Justice in Lo-Ji, the Supreme Court stated:

> He allowed himself to become a member, if not the leader, of the search party which was essentially a police operation. Once in the store, he conducted a generalized search under authority of an invalid warrant; he was not acting as a judicial officer but as an adjunct law enforcement officer. When he ordered an item seized because he believed it was obscene, he instructed the police officers to seize all "similar" items as well, leaving determination of what was "similar" to the officer's discretion. Indeed, he yielded to the State Police even the completion of the general provision of the warrant. Though it would not have validated the warrant in any event, the Town Justice admitted at the hearing to suppress evidence that he could not verify that the inventory prepared by the police and presented to him late that evening accurately reflected what he had ordered seized.

Defendants have presented no evidence showing the undersigned Magistrate Judge acted in any way similarly to the judicial officer in Lo-Ji.  The second exception to Leon, therefore, does not apply in the instant case.

The undersigned also finds the warrant was not so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers could not reasonably presume it to be valid.

Defendants' arguments are generally based on factors 1) and 3).

The undersigned has already found that Sgt. Manning did not knowingly or with a reckless disregard for the truth misrepresent the facts to mislead the undersigned.

Further, a review of the affidavit does not indicate it "was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." This is not a case of a "bare bones" affidavit, relying on anonymous informants.

> A "bare bones" affidavit is one in which an affiant merely recites the conclusions of others - - usually a confidential informant - - without corroboration or independent investigation of the facts alleged . . . . However, a 'bare bones' affidavit is not one with weak inferences, but rather one without facts from which a judge can determine probable cause.

United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). As already discussed, the affidavits at issue here contained much more than the conclusions of confidential informants without corroboration or independent investigation.

For all the above reasons, the undersigned finds the officers' reliance on the search warrant issued by the undersigned Magistrate Judge was objectively reasonable. The good faith exception, therefore, renders the evidence seized in the search admissible, even if it were determined there was not probable cause to issue the search warrants.

## **RECOMMENDATION**

For the reasons herein stated, it is **RECOMMENDED** that Defendants' Motion to Suppress Evidence [Docket Entry 16] and Motion to Suppress Evidence Pursuant to Franks v. Delaware [Docket Entry 17] as joined in by Edgar Henry [Docket Entry 18] be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the

Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 23 day of February, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE